UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BALDWIN INSURANCE GROUP
HOLDINGS, LCC f/k/a BALDWIN
RISK PARTNERS, LCC, THE
BALDWIN COLLEAGUE, INC., and
THE BALDWIN GROUP
SOUTHWEST, LCC f/k/a INSGROUP,
LLC,

        Plaintiffs,

v.                                                                    Case No:   8:26-cv-01212-JLB-CPT

YESENIA GONZALEZ, CODY
HUNTER, BOBBY RITTER, and
EDGEWOOD PARTNERS
INSURANCE CENTER INC. d/b/a
EPIC INSURANCE BROKERS &
CONSULTANTS,

        Defendants.

_____/

## ORDER

Before the Court is Plaintiffs The Baldwin Insurance Group Holdings, LCC

f/k/a Baldwin Risk Partners, LLC, The Baldwin Colleague, Inc., and the Baldwin

Group Southwest, LLC f/k/a Insgroup, LLC's (collectively "Baldwin") Emergency

Motion for an Ex Parte Temporary Restraining Order (Doc. 8) against Defendants

Yesenia Gonzalez, Cody Hunter, Bobby Ritter, and Edgewood Partners Insurance

Center Inc. d/b/a EPIC Insurance Brokers & Consultants ("EPIC").  After careful

review of Plaintiffs' motion and the supporting evidence, Plaintiffs' motion is

**DENIED** without prejudice.

## BACKGROUND

Baldwin is a participant in the highly competitive insurance industry. (Doc. 6 at ¶ 20). Within this industry, Baldwin's client relationships, goodwill, confidential information, and trade secrets are critical to its success. (*Id.*). Accordingly, it has procedures in place to guard against the unauthorized dissemination of its confidential business information and trade secrets. (*Id.* at ¶ 22). One of Baldwin's procedures is to enter into restrictive covenants with its employees to impose obligations on those employees regarding "the preservation of Baldwin's confidential information and non-solicitation of Restricted Customers, Potential Restricted Customers and Baldwin employees." (*Id.*).

Baldwin previously employed Defendants Yesenia Gonzalez ("Gonzalez"), Cody Hunter ("Hunter"), and Bobby Ritter ("Ritter") (collectively, the "Individual Defendants"). (*Id.* at ¶¶ 28, 38, 50). The Individual Defendants are all Texas residents. (*Id.* at ¶¶ 10–12). Within their respective roles while employed by Baldwin, each of the Individual Defendants had access to Baldwin's trade secrets and other commercially sensitive business information. (*Id.* at ¶¶ 28, 38, 50). Each Individual Defendant also electronically signed Baldwin's Protective Agreement as a condition of his or her employment. (*Id.* at ¶¶ 30–32, 41–43, 52–54).

The Protective Agreements that the Individual Defendants signed contained substantially identical terms. (*See* Docs. 6-1, 6-2, 6-3). Each contract contained the following definition of Confidential Information:

> (a) <u>Confidential Information</u>. "Confidential Information" means all information (whether in print, in an electronic format or in any other

media, and whether internally generated or used by the Company Group (or under contract with any third party)) that I obtain or develop or to which I have access during my employment (including periods prior to the execution of this Agreement) and which has not been publicly disclosed, and is not a matter of common knowledge in the areas of business in which the Company Group is engaged, including but not limited to (i) customer, prospective customer and sales agent lists, leads, information and records; (ii) technical data, financial information, personnel information, information regarding sales, costs, pricing, marketing, contracts with third parties, plans for product or market or service developments or improvements, research records, processes, business and strategic plans, and financial forecasts; (iii) information regarding any intellectual property of the Company Group, including all patents, trademarks, trade names, service marks, licenses, and copyrighted materials, and all copies, ideas, designs, methods, scripts, processes, procedures, concepts, inventions, recordings, advertising and promotional materials, and computer programs, software, and source codes, whether or not protected under any law; and/or (iv) any other information that derives economic value from being confidential to or trade secrets of the Company Group or any of its Business Relationships.  For clarity, this definition of "Confidential Information" encompasses and includes all confidential and trade secret information from any entity that the Company Group acquired or acquires, including through a stock purchase, asset purchase or merger.  Confidential Information shall not include any data or information of the Company Group that: (x) is voluntarily disclosed to the public by the Company Group or otherwise enters the public domain through lawful means, except where such public disclosure has been made by me without authorization from the Company Group, or (y) was made available to me on a non-confidential basis from a source other than the Company Group or any of its representatives; provided that the source of such information was not known by me to be bound by a contractual, legal or fiduciary obligation of confidentiality to the Company Group or any other person with respect to such information.

(b) <u>Access and Use</u>.  I hereby agree to keep in strict secrecy and confidence any and all Confidential Information.  I agree that such Confidential Information is and shall remain the property of the Company Group, and, both during and after the term of my employment, without the prior written consent of the Company Group and except in the course of the performance of my employment duties on behalf of the Company Group: (i) I will not use or disclose or cause to be used or disclosed any Confidential Information to any third

3

person, partnership, joint venture, company, corporation, other organization or other third party; (ii) I will not take from any Company Group office for my own use or the use of any third party any document, paper, computer-generated media or other property of the Company Group containing Confidential Information (unless necessary during my employment to conduct business on behalf of the Company Group and in compliance with the Company Group's policies and procedures); and (iii) without request upon termination of my employment, whether such termination is voluntary or involuntary or with or without cause (the date of my termination of employment being the "Last Day"), and at any time that the Company Group may so request, I will immediately deliver to its designated representative at its office that served as the principal place of my employment, or at such other location as it may designate, any document, paper, computer-generated media or other property of the Company Group (and all copies of same) in my possession that contains Confidential Information and will also submit for inspection by the Company Group, any personal cellular phone, computer, electronic or physical storage device with, on, or in which I have used to access or store any Confidential Information or have otherwise connected to any Company Group computer system or server. Notwithstanding the foregoing sentence, I will be permitted to retain copies of my compensation and benefits arrangements, or other personal documents related to my employment (subject to the Company Group's good faith approval of my retention of any other such personal documents), including this Agreement.

(Docs. 6-1 at 3, 6-2 at 2, 6-3 at 2).

Each Protective Agreement also contained the following provision regarding

the duration of the preceding provisions' terms:

(c) Duration of Confidential Information and Trade Secrets. This obligation of nondisclosure and non-use shall last so long as the information remains confidential. I, however, understand that, if I primarily live and work in any state requiring a temporal limit on nondisclosure clauses, Confidential Information shall be protected for no less than twenty-four (24) months after the Last Day. I also understand that trade secrets are protected by statute and may not be subject to any time limits. I also agree to contact the Company Group before using, disclosing, or distributing any Confidential Information or trade secrets if I have any questions about whether such information is protected information.

4

(Docs. 6-1 at 3–4, 6-2 at 2–3, 6-3 at 2).

The Individual Defendants also agreed through their respective Protective Agreements not to "solicit or encourage any Restricted Customer (defined below) or Prospective Restricted Customer (defined below)" to terminate a business relationship with Baldwin or to commence a similar business relationship with any other individual or business entity. (Docs. 6-1 at 4, 6-2 at 3, 6-3 at 3). Furthermore, the Individual Defendants could not solicit other Baldwin employees to terminate their employment relationships with Baldwin. (*Id.*).

Each of the Individual Defendants' employment relationships with Baldwin eventually ended. (Doc. 6 at ¶¶ 37, 48, 59). Hunter was terminated for cause by Baldwin on September 8, 2025. (*Id.* at ¶ 48). Baldwin claims that he then solicited Gonzalez and Ritter to leave Baldwin and join him at EPIC. (*Id.* at ¶ 49). Gonzalez and Ritter resigned from Baldwin on April 16, 2026, and Baldwin believes that they solicited each other to join EPIC. (*Id.* at ¶¶ 37, 59). Prior to resigning from Baldwin, and at Hunter's behest, Gonzalez allegedly forwarded Baldwin's Confidential Information to her and Ritter's personal email addresses. (*Id.* at ¶ 62). These emails allegedly contained documents regarding Baldwin's pay structure, customer information, and monthly reports. (*Id.*). Balwin also notes that Gonzalez scheduled a meeting with a Restricted Customer and Ritter a few months before they left the company. (*Id.*).

Since the Individual Defendants left Baldwin, Baldwin claims that they have continued to take actions in violation of their Protective Agreements, including

soliciting Restricted Customers.  (*Id.* at ¶¶ 48, 59).  Shortly after Gonzalez and Ritter resigned, Baldwin began to receive Broker of Record ("BOR") letters from insurers indicating that the customers formerly serviced by the Individual Defendants wished to change brokers.  (Doc. 8-2 at ¶ 7).  At the time Baldwin filed the motion for a temporary restraining order, nine customers had issued BOR letters to Baldwin.  (*Id.* at ¶¶ 7–11).  "Baldwin has received verbal or written confirmation regarding nearly all of the customers that they intend to purchase insurance from the Individual Defendants and EPIC moving forward."  (*Id.* at ¶ 11).  Baldwin contends that the loss of these customers translates to more than $1,100,000 in lost annual revenue.  (*Id.* at ¶ 12).

Consequently, Baldwin filed this lawsuit against Defendants on April 24, 2026.  (Doc. 1).  Baldwin's operative complaint (Doc. 6) asserts claims against Defendants for violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, the Florida Computer Abuse and Data Recovery Act, Fla. Stat. § 668.803, as well as Florida state claims for breach of contract, breach of fiduciary duty, conversion, conspiracy, tortious interference with business relationships, and attorney's fees.  Baldwin files this Emergency Motion for an Ex Parte Temporary Restraining Order (Doc. 8) based on its DTSA, breach of contract, and tortious interference with business relationships claims.

## LEGAL STANDARD

A court may issue a temporary restraining order pursuant to Federal Rule of Civil Procedure 65 if the moving parties demonstrate: (1) a substantial likelihood of

success on the merits; (2) irreparable harm will ensue absent such an order; (3) the threatened injury to the movants outweighs the harm the restraining order would cause to the non-movants; (4) the restraining order would not be adverse to the public interest. *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034–35 (11th Cir. 2001). "The purpose of a temporary restraining order, like a preliminary injunction, is to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005). A court may grant an ex parte temporary restraining order only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). The grant or denial of a motion for a temporary restraining order or preliminary injunction rests within the sound discretion of the district court. *LSSi Data Corp. v. Comcast Phone, LLC*, 696 F.3d 1114, 1119 (11th Cir. 2012).

## DISCUSSION

The Court denies Baldwin's Emergency Motion for an Ex Parte Temporary Restraining Order (Doc. 8) because Baldwin has failed to demonstrate a substantial likelihood of success on the merits of its claims. As an initial matter, Baldwin has failed to meet its burden as to the Individual Defendants because its allegations do not establish that the Court has personal jurisdiction over them. Next, Baldwin fails to demonstrate that it has a substantial likelihood of success on the merits of

its claims against EPIC, as the evidence it provides does not support such a finding. The Court will discuss each issue in turn.

## I.   Baldwin Has Failed to Establish that the Court Has Personal Jurisdiction over the Individual Defendants.

Baldwin must first show that the Court can exercise personal jurisdiction over the Individual Defendants before it can establish that it has a substantial likelihood of success on the merits of its claims against them.  *See Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 n.6 (11th Cir. 1999) ("A court without personal jurisdiction is powerless to take further action."); *Viral DRM, LLC v. Unknown Counter Notificants*, 688 F. Supp. 3d 1271, 1275 (N.D. Ga. 2023) ("[T]he most basic prerequisite for a TRO is adequately establishing that the Court may exercise personal jurisdiction over the defendants.").

To determine whether personal jurisdiction exists, the Court must perform a two-step inquiry.  *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996).  First, the Court "must determine whether the Florida long-arm statute provides a basis for personal jurisdiction."  *Id.*  If it does, then the Court must determine "whether sufficient minimum contacts exist between the defendants and the forum state so as to satisfy 'traditional notions of fair play and substantial justice' under the Due Process Clause of the Fourteenth Amendment." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Florida's long-arm statute enumerates specific acts that subject a person to a court's personal jurisdiction.  *See* Fla. Stat. § 48.193.  Federal courts are bound to apply this statute as the Florida Supreme Court would, and they must construe it

strictly. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1352 (11th Cir. 2013) (citations omitted). Relevant here, section 48.193(9) gives courts personal jurisdiction over persons that form contracts compliant with Florida's long-arm statute. *See* Fla. Stat. § 685.102. Section 685.102, in turn, authorizes personal jurisdiction over parties to contracts made pursuant to section 685.101, Florida Statutes. Section 685.101 permits parties to agree to apply Florida law to the extent permitted by the United States Constitution and where such contract is "in consideration of or relating to any obligation arising out of a transaction involving in the aggregate not less than $250,000 . . . ." Notably, however, that section cannot apply to contracts "[f]or labor or employment." Fla. Stat. § 685.101(2)(b).

Here, Baldwin has failed to sufficiently allege that the Court has personal jurisdiction over the Individual Defendants. For starters, each Individual Defendant is a Texas resident, meaning the Court does not have general jurisdiction over them under Florida's long-arm statute. *See* Fla. Stat. § 48.193(2). And Baldwin's sole basis for alleging specific personal jurisdiction over the Individual Defendants is that their Protective Agreements contain forum-selection clauses in which they consent to personal jurisdiction within this Court. (Doc. 6 at ¶¶ 15–17). Standing alone, these provisions cannot establish personal jurisdiction over the Individual Defendants because the Protective Agreements are employment contracts, which are exempted by Florida's long-arm statute. *See* Fla. Stat. § 685.101(2)(b). Indeed, each contract states that it was entered into in consideration of the respective Individual Defendant's employment with Baldwin. (Docs. 6-1 at 2,

6-2 at 2, 6-3 at 2).  Baldwin alleges no other facts that would permit the Court to exercise personal jurisdiction over the Individual Defendants.  (*See* Doc. 6). Accordingly, the Court lacks personal jurisdiction over the Individual Defendants, which is a nonstarter for Baldwin's ability to demonstrate the elements for issuance of an ex parte temporary restraining order against the Individual Defendants.

## II.   Baldwin Fails to Demonstrate a Substantial Likelihood of Success on the Merits on Its Claims Against EPIC.

Baldwin's claims against EPIC under the DTSA and for tortious interference with business relationships also cannot justify a temporary restraining order on the record currently before the Court.

Starting with Baldwin's DTSA claim, the DTSA provides a private right of action for the owners of trade secrets to prevent the misappropriation of those trade secrets in interstate commerce.  *See* 18 U.S.C. § 1836.  The DTSA defines "trade secret" to mean "all forms and types of financial, business, scientific, technical, economic, or engineering information" if "the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).  The DTSA also defines "misappropriation" to mean "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of

10

disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5).

Here, Baldwin took reasonable measures to protect its trade secrets. Courts commonly treat records of client contact information and preferences as trade secrets because they can be highly valuable and may contain information not publicly available. *Freedom Medical, Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1275–76 (M.D. Fla. 2020) (citations omitted). Baldwin entered into Protective Agreements with the Individual Defendants and its other employees to protect this client information and the remainder of its defined Confidential Information from unauthorized disclosure. (*See* Docs. 6 at ¶ 23, 6-1, 6-2, 6-3).

However, based on the evidence currently before the Court, Baldwin has failed to demonstrate a substantial likelihood of success on the merits of its DTSA claim. Baldwin alleges that EPIC is both vicariously and directly liable under the DTSA "because, through the Individual Defendants, it possesses and is misusing Baldwin's trade secret information." (Doc. 6 at ¶¶ 83–84). In support of this claim, Baldwin's Verified Complaint alleges that Hunter encouraged Gonzalez and Ritter to send Confidential Information to their personal email accounts before leaving Baldwin and that Gonzalez and Ritter did so. (*Id.* at ¶ 62). Moreover, Baldwin recounts that there were four occasions on which Gonzalez sent documents to her personal email or arranged meetings with Restricted Customers using that email. (*Id.*).

While these actions could constitute the misappropriation of trade secrets by Gonzalez and the other Individual Defendants, the evidence before the Court, absent more, does not demonstrate a substantial likelihood of success on the merits on its claim against EPIC.  Put simply, Baldwin provides no specific evidence or records, redacted or not, concerning the nature of the documents that it alleges that the Individual Defendants misappropriated.  (*See id*; Doc. 8-2).  The allegations of Baldwin's Verified Complaint and the affidavit attached to its motion are the full extent of the evidence that Baldwin has provided at this juncture.  (*See* Docs. 6, 8-2).  This Court typically requires a stronger evidentiary basis to conclude that a movant is substantially likely to succeed on the merits.  *See, e.g., Naples Cheer Academy Inc. v. Naples Element All Stars, LLC*, 2:25-cv-296, 2025 WL 2852250, at *3 (M.D. Fla. Apr. 24, 2025) (finding a likelihood of success on the merits where the movant provided a forensic report of the defendant's database activity shortly before the defendant left the company).  Consequently, the Court is unable at this time to conclude that Baldwin will be likely to prevail on the merits of its DTSA claim.

For similar reasons, Baldwin has failed to show that it is substantially likely to succeed on the merits of its tortious interference with business relationships claim against EPIC.  To state a claim for tortious interference under Florida law, a plaintiff must allege: (1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) an intentional interference with the contract by the defendant; (4) unjustified interference with the contract by the defendant; and (5) damage to the plaintiff because of the contract's breach.  *Johnson Enters. of*

*Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998).  On the evidence before the Court at this time, the Court is unable to conclude that Baldwin is likely to succeed in proving that EPIC engaged in unjustified interference with Baldwin's contracts by exploiting Baldwin's trade secrets or using Confidential Information that it acquired from the Individual Defendants.  In addition to Baldwin's failure to clearly provide the specific facts that are needed to justify an ex parte temporary restraining order, *see* Fed. R. Civ. P. 65(b)(1)(A), Baldwin would likely also face difficulties in showing that EPIC's solicitation of Baldwin's clients did not fall within a recognized privilege.  *See, e.g., Johnson Enters. of Jacksonville, Inc.*, 162 F.3d at 1321 ("Florida law recognizes the principle that actions taken to safeguard or protect one's financial interest, so long as improper means are not employed, are privileged.") (citations omitted).

Because Baldwin fails to demonstrate a likelihood of success on the merits of its claims, the Court need not address the other elements necessary for the issuance of a temporary restraining order.  *See Ingram v. Ault*, 50 F.3d 898, 901 (11th Cir. 1995).

Accordingly, Baldwin's Emergency Motion for an Ex Parte Temporary Restraining Order (Doc. 8) is **DENIED**.

**ORDERED** in Tampa, Florida, on May 7, 2026.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE

13